I think you all are familiar with all the rules. Please remember the timing. When you get the yellow, you're getting close. When you get the red, you're done. Unless we keep asking questions, in which case you stay and answer them. But otherwise, you are done. So with that, we'll go ahead and get started with case number 22-40116, Lozano v. Collier. And we will begin with James Shepherd. May it please the Court. My name is Robert Shepherd, and I am representing Appellant Eric Lozano, pro bono. What was he convicted of? Why was he in prison? I'm sorry, Your Honor? What was he convicted of? Why was he in prison? Your client. I believe it was a drug charge. I would have to double-check the record, but that's my understanding. No, I'm asking you. Yes, Your Honor. I'd like to start by saying that although this is an Oral Lupa case and Oral Lupa law is quite complicated, really, much religious liberties law can be challenging. Really, we're just here on summary judgment, and it's about the summary judgment standard. And as this Court recognized in Brown and Mayfield, these are very fact-intensive cases and need to be looked on a case-by-case basis. Mr. Lozano is not asking this Court to rule on the merits of his claims. He believes he will be successful at trial, and he believes that he has brought claims that are very important not only to him, but to other inmates as well. However, really, here today, he's just arguing that summary judgment has been granted improvidently because numerous factual disputes preclude the Court's ruling with respect to each of his claims. With the fact that he's now housed in a cell rather than a dormitory, does that change our appreciation of what you're asking for? Yes, it's on cell now. Yes, Your Honor. Actually, in fact, it makes the facts worse with respect to his prayer — his ability to have space to pray because he no longer has a cubicle. And instead, he's housed in a cell with other inmates, and the facts show that the TDCJ has suggested he can just simply pray on his bunk. However, there's not sufficient space. Prayer requires — Is he still in the situation where he's having his fellow prisoners attack him while he's praying and that kind of thing? To my knowledge, yes, Your Honor. Okay. So that hasn't changed? That has not changed. Okay. He had asked for a Muslim-only dorm. Yes, Your Honor. How many Muslims are actually in this prison, where he is? Roughly — I believe the number is somewhere around 9,900. It's above —      Yes, Your Honor. Across Texas? Yes, Your Honor. Across Texas? Yes, Your Honor. Across Texas? Yes, Your Honor. Okay. Across Texas? I'm sorry. That's across Texas. This isn't where he was trying to pray. I'm not exactly certain just how many Muslims — my understanding is that it is larger than the Jewish and Native American populations, which do have designated dorms. Okay. And in any event, there's enough that they could put them in the cell with him? Is that the notion, that at least if he's sitting around being attacked by people who hate Muslims, that he could at least be put with Muslims? Is that your argument? Or at least one of the facts you think need to be addressed? Yes, Your Honor. That is part of the argument, is that that is a least restrictive — or that is a means that should be considered and is likely more akin to a least restrictive means in furtherance of a compelling government. I mean, in other words, swirling around people within that prison doesn't sound like it's expensive. Is that your argument? That — how can they say we can't put, you know, Muslims in there, or at least more polite people of other religions who aren't going to sit around and attack someone praying? With respect to his — to his — so, his — a number of different claims, but with respect to his ability to pray, the time required to pray, and his unit request, yes. I mean, effectively, that is kind of the claim, which is the TDCJ says that's simply not possible or it's foreclosed under Brown. However, materially disputed facts call into question whether that is possible and whether their failure to accommodate and — in an attempt to satisfy time, means, security issues, actually — their solution actually furthers that interest. Okay. And what about in the shower? I'm — I'm just wondering, is the notion that if you said from 9 to 10 on Friday, we'll put Muslims in the shower, and then from 10 to midnight, anybody else that wants it, is that the — kind of the notion of what he's suggesting would be doable? I — I believe so. I mean, I'm just trying to understand the logic. You know, there's — there's all this up here, which is important, but in terms of, like, the facts, I'm just trying to understand that. Again, would that be costly for the prison or not? Is that — you know, just — is there just, like, such a situation where you could say, this is — we're going to only put Muslims in the shower at this particular time because they're getting ready to go and they need to shower calmly and all of that before their service? Is that the idea? And I'm just trying to understand it. Yes, that's exactly — Okay. I mean, basically, you know, however you accomplish this means, however — whether it's by scheduling or whether it's by, yeah, ensuring that all Muslims shower together or all Muslims that want to participate in Juma services shower together, that they have a specific time, that those sorts of timeways means that there are materially disputed facts regarding whether that's possible or not and whether the TDCJ's claim that it's not is. I mean, for example, there's — on the Ellis I unit, they provided lay-ins and separate showers for — and on the Michael unit, they allowed religious groups to shower separately. So that calls into question whether they could do it here on the Springfellow unit. Same thing, the Hallporters, kitchen staff, the other employees of the TDCJ, to the extent that they are required to be there, also are provided separate showers. And newer units do have individualized showers. But even more important than that is just simply that Mr. Lozano has proposed an even less restrictive means to accomplishing this goal, which is just provide him a divider so that he doesn't have to look at other people. And — He would still hear the harassment or whatever he's complaining of, that they were yelling at him. Right. The dividers simply — the dividers accomplish the modesty aspect of it. But you are correct that another problem in the facts that are disputed with respect to that aspect is the uncleanliness component, which is that the evidence in the record shows, both from Mr. Lozano and Mr. Johnson, by affidavit, that they need to be able to shower with other Muslims because they will not hear cussing and idle talk, they won't see homosexual acts, which in their religion renders essentially the shower unclean. I agree that — Why would that be something the prison would tolerate anyway, people having homosexual acts in the shower? Why isn't that better controlled? That might be a better question for the TDCJ. My understanding is that they probably wouldn't, but I don't know that — That they wouldn't allow it? I cannot say whether there's a policy or not prohibiting that. I would expect there is. However, I am unsure how you can enforce that policy effectively, sitting here today. And I think it's kind of generally known that those sorts of activities can happen in the prison setting. Well, it is a prison. You would think they could control something? I would hope, Your Honor. So what's your best support for the notion that they should be allowing more of these I'm sorry if I'm mispronouncing them. And so on. What's your best argument on that and your best case on that? So I think Mayfield is the most on-point case. It involved odinous and it involved volunteers — essentially disputed facts over volunteers and whether policies were being applied uniformly, whether the TDCJ had taken steps to recruit volunteers adequately. That's essentially the facts that we have here. The facts in this case are that the TDCJ has admitted they are understaffed on Muslim chaplains, that chaplains are responsible for recruiting volunteers, and that there's actually — there's evidence in the record showing that the TDCJ has discouraged other volunteers from actually attending, simply because they've failed to communicate whether there are lockdowns and those individuals have been required to wait outside the prison for long, extended periods of time. There are — those volunteers, similarly to other Muslim inmates, have been discriminated based on preconceived notions related to Islam and many of the things that are culturally going on right now with respect to terrorist acts and such. So that — the evidence in the record shows that the TDCJ, in addition to not — in addition to — sorry, I lost my train of thought. The TDCJ shows — the evidence shows that the TDCJ, in addition to not hiring enough chaplains to actually hire volunteers, that the record is — the facts in the record are disputed, essentially whether they are not — whether they are actively putting in place policies and enforcing those policies in such a manner to make it possible for the volunteers to come and lead Talim and Quranic studies. And the fact that really supports that is that, prior to the motion for summary judgment, those studies had not been held in a year. And it's my understanding they have not been held up to this day, which is three-and-a-half years later. But volunteers have to be paid. They're volunteers. Do they have to be paid? Is that what you're talking about, paying? Yes, Your Honor. I do not know the answer to that question. I'm not — I do not believe so because they're volunteers, but I don't have that specific answer. Well, it would make a big difference if they didn't need to be paid. Well, if they didn't — well, the volunteer requirement, as I understand it, is in place because the — is because the TDCJ does not have required — or sufficient staff to be able to oversee each one of these studies, essentially, or each one of these study sessions. And so they're saying it has to be led by a volunteer because of security concerns. But it's kind of — I mean, there's case law on the volunteer requirement and whether it's — whether it's appropriate or whether there are less restrictive means to accomplishing that, which is exactly what Mr. Mlazano is arguing. He's saying there are other ways in which you can accomplish that requirement. For example, you can have inmate volunteers. The policies specifically state — the TDCJ's policies specifically state that chaplains — policy AD 07.30 allows chaplains to make use of inmate volunteers, and policy 12.01 permits inmates to lead religious services with preapproval of the chaplain. So you could simply have an inmate be the volunteer, and you wouldn't need to pay the inmate, to my knowledge. Further, Mr. Mlazano has offered — or has proposed the idea that you provide TVs and services can be accomplished without a volunteer at all. That doesn't — that doesn't also speak to just the fact that the security concerns that are cited by the TDCJ with respect to this issue, they're kind of citing to general security concerns that apply across the prison. But Davis v. Davis, in this court, Davis v. Davis, they — the panel said that — sorry, the analysis needs to be done as to Mr. Mlazano individually, whether he poses a security concern, and the facts on that are disputed as well. He's a G-2 offender, which means he's low-risk. He has no history of any sort of incidents in the prison. And what does TDCJ say about his — I mean, what is their fear of him personally? They have not articulated a fear of him, to my knowledge. Just in general, of prisoners, not of him specifically, is that what you're saying? Correct. Okay. There's — I'm not aware of anything in the record which speaks specifically to a security risk with respect to Mr. Mlazano. And that would make a difference, right? If he was going around killing everyone in the building, that would make a difference. I believe so, Your Honor. I hope. Yes. I mean, that would make sense for why you would need supervision of the Talim and Quranic studies that involves him. And for example, I mean, I'm just kind of coming up with this off the top of my head, but the volunteers' requirement — I mean, you can get around that, and you can have inmate volunteers. And if you're still concerned about security concerns, you can simply say, well, a day before the studies, everybody has to sign up who's going to attend, and we'll double-check the list and make sure that we don't have any security concerns. Do you want to address anything besides our loop in your last 50 seconds? Oh, just simply that the facts on the record regarding the Establishment Clause claim and equal protection, I mean, there's a lot of evidence in the record that simply shows that whether intentional or not, Native American and Jewish dorms are entitled — or are essentially granted additional protections and additional rights that a Muslim dorm would be afforded if it was established and that Muslim inmates are not afforded right now. And that's recognized by this court in Brown in particular, where they — where this court said that those other dorms on average get five hours more of secondary religious services than — Okay. Thank you. You've saved time for rebuttal. All right. Benjamin Mendelson. May it please the Court. Our LUPA does not require religiously segregated facilities, but Mr. Lozano's our LUPA claims relating to showers and cell assignments are moot because he is no longer housed in the Stringfellow Unit. Additionally, he fails to meet standings traceability requirement as to his claim regarding a designated Muslim unit. I want to be sure to address those jurisdictional issues first and then proceed to the merits of Mr. Lozano's claims. So first, it's important to remember that the District Court correctly held that our inmates, because sovereign immunity is not waived and because this Court held that there is no individual cause of action for damages against individuals. So he may only seek prospective injunctive relief under our LUPA. On page one of the brief that Mr. Lozano filed pro se, he stated that he was in the LeBlanc Unit, not the Stringfellow Unit, where all of the facts in the District Court were developed and where this case occurred. TDCJ's online records, which are subject to judicial notice, the publicly available inmate search, confirms that he is, in fact, housed in the LeBlanc Unit now. And it's important to remember that as it relates to the shower claims, Mr. Lozano did not challenge any policy or TDCJ statewide policy, but rather challenged the actions of one individual, and that was the defendant, Chaplain Watkins, who was the defendant of the Stringfellow Unit at that time. In fact, at Record 620, Mr. Lozano states that Stringfellow is the only unit I've been on that does not allow Muslims to shower with only Muslims. At Record 5— Does he get to shower with only Muslims in the LeBlanc Unit? This Court — so he has stated that he has been in the LeBlanc Unit before, and this Court is aware of that because in Lozano v. Schubert, the case in which Mr. Lozano sued regarding kosher meals, the Court's opinion reflects that he was in the LeBlanc Unit at that time. And then, I mean, you represent TDCJ, so I assume — I mean, can you tell us what Director Collier would say with respect to the Muslim-only shower policy in the LeBlanc Unit? I'm certainly — I'm certainly aware that the Court's opinion from 2022 reflects that he was in the LeBlanc Unit and that his statements say that at all the other places that he was — that he has been previously housed, he was able to — I'm not aware of the LeBlanc Unit's policies because they're not in the record. But it wouldn't be true that the Director could moot an Arlupa case by moving an inmate while the appeal was pending, I assume. So I guess — I guess what I should say about that is that TDCJ's policies, and this is at Record 295, explain that the unit chaplain and the unit warden under TDCJ's policies are responsible for the coordination of Juma showers. It's not a decision that the Director makes. And because Mr. Lozano has both stated that at all of the other units he's been able to shower separately, and additionally, this is at Record 551, he stated — he explains in his declaration in opposition to TDCJ's motion for summary judgment that he believed he should be able to shower by himself and that at other places he had been able to. And in fact, he explains that he showed — that he showed Ms. Watkins' documentation suggesting that — But if we dismiss this, can't y'all put him back in Stringfield and he's back in the mess? It does seem — Judge Oldham's question to kind of further on it, it does seem y'all can just keep moving him around so we can never rule. And that doesn't seem exactly proper here since he's suing the TDCJ people. So I guess there's two possible answers to that question. The first is there are three named defendants in this case. There's Mr. Collier, there's what was originally Ms. Davis, now Mr. Lumpkin, and Ms. Watkins, the chaplain of the Stringfellow unit. If I understand the Court's question to be asking about the voluntary succession doctrine, the voluntary succession doctrine wouldn't be applicable because this is not a situation in which the challenged policies have stopped. This is a situation where he's simply been moved to a different unit. In other words, he's not suggesting that Chaplain Watkins has changed her policies at the Stringfellow unit. Well, what about capable of repetition yet evading review? I mean, the concern that I would have is that, sure, let's just give you — I have an independent question, which is whose burden is it to show mootness? So maybe you can deal with that first. But then second, because I assume you're suggesting it, I assume it would be TDCJ's burden to establish mootness and that you can meet your burden there, then why wouldn't we just say you absolutely could move him back to Stringfellow? It's evading review precisely for the proposition that he seems to get moved around a lot. So we would just blow right through it. Sure. It's certainly true that he's been moved around a couple times, as the Court's opinion reflects. He was in LeBlanc, then Stringfellow, then back to LeBlanc. That is certainly true. I think the issue with capable of repetition yet evading review is he's certainly been in many places long enough to where review — to where certainly we would think review could be had. He's been in the Stringfellow unit for a relatively lengthy period of time. It happened that in the brief that he filed pro se, he stated that he was no longer at the LeBlanc unit. I would also point out this Court has held in cases like Sossaman and in Freedom from Religion v. Abbott, the case regarding the good faith presumption as it relates to the State as opposed to private parties. And one of the things that Sossaman pointed out was that especially in a situation in which the State prevails below, that may suggest that the good faith presumption should apply. But is — can you help me on the burden? Is it — I assume — it's obviously his burden to establish jurisdiction at the outset of the case. Whose burden is it to show mootness today on October 3rd? Sure. Yeah. Of course, mootness would be the State's burden. There's not a question about that. The exceptions, of course, maybe not. Got it. But the actual mootness, sure. But I think another point is it could also be framed in terms of traceability in the sense that because Mr. Collier and Mr. Lumpkin do not set policies as it relates to showers, TDCJ's policies explicitly state the unit chaplain and the unit warden do, there's not a proper defendant to issue prospective injunctive relief on the other side of the V, on the defendant's side. And why would it not be the statewide officer's obligation to make the relevant accommodations, right? I mean, one of the things that makes ARLUPA different than other statutes is that it's not just that you have an obligation to, you know, to — to prevent affirmative discrimination. You have to make actual accommodations. So simply saying, like, hey, not my problem may work in other circumstances for other legal claims, but it's not clear to me it whole nature, the thrust of the legal argument is, I'm a Muslim. I have a right to exercise my religious faith. You have an obligation under ARLUPA to accommodate it. Sure. I guess the best answer I can give is that TDCJ has delegated that authority to individual units. TDCJ's own policies say that Mr. Collier does not make that decision and that Mr. — Mr. Lumpkin does not make that decision. And as — as the Court was alluding to, if we're talking about something like capable of repetition yet evading review, the exceptions to mootness, the burden would be different than, of course, the burden to show mootness in the first instance. Can you point me to the page in your brief where you address this? So mootness — mootness — mootness is not in our brief. Of course, arguments against the Court's subject matter jurisdiction may be raised at any time. I'm well aware of that, but you said we had the jurisdiction. This was after the briefing by the pro se. Correct. Correct. This issue was only brought to my attention relatively recently. And you didn't think it would be helpful to, like, write us a letter or anything on that? I apologize for that. You thought it would be better to make sure your opponent isn't prepared to address that? No, Your Honor. No, Your Honor. This issue came to my attention relatively recently. The other — I have a question about the showering set-ups, where there's an allegation that Native Americans can shower together and that Jewish people can shower together, but that they won't set up something for the Muslims to shower. How many Muslims would there be? Are the numbers relatable? I mean, are there many more or many less? What's going on? Sure. So I think there's two answers to that. The first is, I'm not sure the claim is Native Americans showering together. I think the claim is the Native Americans have been given certain types of religious accommodations. That may be a little bit different from the act of showering. The answer to the Court's question is there are approximately 83 Muslim inmates in the Stringfellow Unit and approximately 66 Muslim inmates in the LeBlanc Unit. Those numbers are both in the record. There's approximately 9,000 Muslim inmates within all of TDCJ statewide. And how many Jewish and Native American in those places? In the Stringfellow Unit, there are approximately 31 Jewish inmates, approximately 34 Native American inmates. In the Lozano Unit, I believe approximately 17 Jewish inmates and approximately 143 Native American inmates. So supporting them as opposed to the people that Lozano is with strikes me as, how is that not discriminatory? If you say, well, we can't help this one guy because there's only one and we can't deal with just one, but it sounds like they're helping a smaller group and discriminating against a bigger group. Why is that not the case? We certainly don't think that there's any form of discrimination going on. We're certainly aware that Native American inmates and Jewish inmates have received other types of religious accommodations. But as this Court has explained, different religious accommodations certainly are based on different… Well, obviously there are different religions, but where one religion is getting everything they need and the other one is being kind of thrown in the bucket, why is that not discrimination? To the extent that the Court is referencing Mr. Lozano's Establishment Clause claim, certainly there are many cases, including Cutter and perhaps most recently the Coach Kennedy case, that explain that simply because one religion is receiving some type of accommodations does not mean that it violates the Establishment Clause. Certainly TDCJ may, and I would also point out that the evidence as to the Establishment Clause claim that Mr. Lozano points out simply points out the fact that Jewish inmates are being provided kosher meals or Native American inmates are being provided other certain religious accommodations. There's a difference between that and suggesting that the state is somehow discriminating, which we certainly do not think is correct. This Court is certainly aware that in other cases this Court has written about the problem of the lack of volunteers. That's certainly been a problem that's been going on for a few years, as this Court is aware from the Brown v. Collier case. But this Court has also held in cases like Baranofsky and Atkins and most recently in Brown v. Collier that if a substantial burden exists, it's because, unfortunately, of the lack of volunteers and not of TDCJ's policies. But Lozano's argument is y'all are not trying. You're making it hard on volunteers. If I were volunteering for something and I was being left outside for hours in the rain, I maybe wouldn't want to volunteer again. So I think the point is, if you're making it hard for the volunteers, and I'm not saying you are, but that's the allegation, and this is a summary judgment scenario, not a trial, then why isn't that a problem? Well, there's certainly nothing in the record to suggest that that's happening at the LeBlanc unit where Mr. Lozano is being housed right now. There is something in the record pointing to a volunteer perhaps being turned away, but it's not clear where that happened or when that happened. And it certainly doesn't suggest that it happened at the LeBlanc unit because that complaint was written at the time that Mr. Lozano was housed in the Stringfellow unit. I also want to be sure to address— Before you leave volunteers, are they paid? Does the prison have to pay them? My understanding is that they're not paid because they're approved volunteers, so they have to go through some type of security or screening, of training, yes. But my understanding is that they're not. Also, the other point I should make as to the point about volunteers is simply that both the Stringfellow unit and the LeBlanc unit are located, and one of them is located in Resheron, Texas, 40 to 50 minutes from downtown Houston. The other one is located approximately an hour and a half in Beaumont from downtown Houston. Houston, of course, is by far the largest and most diverse city in Texas. It's the fourth-largest city in America, and Harris County is the third-largest county in America. And because this problem has been going on for a long time, I think it's important to remember that there's a little bit of a speculativeness issue of Mr. Lozano is not asking that TDCJ create a Muslim-designated unit simply so that he can live there. He's saying that TDCJ should create a Muslim-designated unit so that it may increase the odds of additional outside volunteers coming to do additional religious programming, such as Talim. The problem with that is if this has been going on certainly since before the COVID pandemic, because Brown was decided in 2019, it's speculative to suggest that if such a unit were created, that volunteers that have always, if they were there from downtown Houston or from the Houston area, would come. So there's a little bit of a speculativeness standing issue on standings redressability prong there as well. Mr. Mendelson, while we're on designated housing, I recognize that you didn't sign this brief, so I apologize if this is an unfair question, but I wanted to know if you could help me understand the red brief. And there's a sentence in here on page 5 that says, that refers to Jewish and Native American religions that merit designated housing, a designation that is more amenable to Jewish dietary restrictions and Native American pipe-smoking ceremonies. Can you help me understand the nature of like TDCJ's designated housing accommodations for Native Americans and Jewish inmates? Sure. So when TDCJ uses the term designated unit, I think the most important point here is that that is not some type of religiously segregated housing. It's an area where some of that, where, where Jewish inmates or Native American inmates may be housed, but that does not mean that you have to be a member of one of those groups to house there. Do the inmates get to choose? Do they say like, I'm an observant Native American and I need to engage in the pipe-smoking ceremony so I can go to this unit? Not, not entirely. And I think this is another important point as to why the relief might be speculative. And that is that when TDCJ implemented this, this is in the record as regards to Native Americans, they surveyed approximately 380 Native American inmates. Only about 90 of those, there's two criteria. First, they have to be interested in going to a designated unit and willing to transfer from another unit. But the other is that they have to be eligible to, certainly part of that would mean whether or not they might meet the security requirements, whether or not they might be a security risk. Certain inmates that are higher security, have higher security problems, would not, would not be able to do that. So the point is, is that both an inmate has to be interested and willing to transfer, but also meeting TDCJ's security criteria, I believe. And so there's certainly a question of if the same policy were implemented for other religions, we simply don't know how many people would both meet the security criteria, but also even be interested or willing to transfer. Yeah, but our loop isn't something about just making it as easy as possible on your people. It is trying to address the need of these people to have their religion, whether they're Jewish, Muslim, Christian, Native American, or something else, right? Sure, so our loop of... So this notion of this relief of speculative relief or something like that, how is that clear on the summary judgment, as opposed to something you may prevail on later? Well, I think that's part of a redressability point, as well as a point about simply, substantively and practically, whether the relief that he's asking for is actually going to help him get more talim or get, excuse me, have more religious programming. And additionally, of course, the burden doesn't shift to the state until the substantial burden requirement is met. And this Court has held at least three times that the lack of outside volunteers is the reason for the substantial burden, as opposed to TDCJ's policies. My argument on that has been that y'all are the one causing the problem with the volunteers, as opposed to just, there ain't no volunteers. Particularly since you just said, oh, there are a lot of people out there. So it's not like the middle of nowhere in Texas, which there are a lot of middles of nowhere in Texas, but this in one of them, according to you. So I'm a little confused about that. Well, I think Mr. Lozano references one thing in the record that suggests that a volunteer had been turned away. We don't know when that was. We don't know where that was. Based on when he wrote the complaint, that was likely, or at least based on, because he was in the Stringfellow unit when he wrote that complaint. But there's certainly nothing to suggest exactly when or where that happened. And there's certainly nothing to suggest that that happened in the LeBlanc unit where he is right now. I also want to be sure to address another standing point as it relates to, well, to this claim, the claim regarding whether TDCJ should establish a Muslim-designated unit. It's also, I think, important to note that TDCJ's policies state that the organization that makes that decision is an organization called the Religious Practices Committee. This is at record 234, which states that decisions of what is called the RPC, the Religious Practices Committee, shall be final. And at record 242, TDCJ defines the term designated unit to mean a unit that is selected by this committee. And this is, again, at record 238, 242, where TDCJ explains that the three voting members of that committee are Mr. Lumpkin, the head of the Rehabilitation Programs Division, and the one that actually has the controlling vote, which is the Deputy Executive Director of TDCJ, which is going to be at record 234. And because only one of those three members is a named defendant, particularly the one who isn't is actually the one that has the controlling vote, which would be the Deputy Executive Director, we think there's also a traceability problem there because the person that actually has the final say in TDCJ is not a named defendant of this case, and that would be the Deputy Executive Director of TDCJ. And that's at record 234. So I wanted to be sure to point that out. And then finally, I guess the one other point that I wanted to be sure to make is as it relates to the Establishment Clause claim, it seems that Mr. Lozano's argument doesn't have a limiting principle in the sense that simply because TDCJ has made other types of religious accommodations for Jews or Native Americans, that must mean that it violates the Establishment Clause. And I think I addressed that a little bit Okay. Thank you. All right. Mr. Sheppard? I would like to address just a couple of the points raised. Well, you maybe want to deal with the jurisdiction. That's principally the one. Okay. Thank you. The TDCJ raised various jurisdictional arguments regarding standing, mootness. I would first like to say that I agree with Judge Oldham that likely this would fall within capable of repetition yet evading review. It seems counterintuitive simply to allow the Texas prison system to move an inmate around such that then the state may make arguments like he's not housed in that unit any longer. And as you said, Judge Haynes, there's nothing stopping them from moving him back to that same unit. I'll be frank. I'm not 100% certain what the arguments are regarding traceability and redressability. They've been raised for the You know, as pro bono counsel, we filed a supplemental brief, and we had no problem with the TDCJ filing an additional brief to address or to respond to our brief. But that was not filed. Also, there's no 28J letter on file or anything to alert me to these arguments. So I'm not even certain what is being argued. And I would say this. We are bound by the facts that are in the record before the district court. Many of the arguments being made here are just simply adding new facts to the record. Counsel, can you help me with one thing that is, I think, in the record that I'm hung up on? The nature of this volunteer claim about who would teach the Quranic and Talim studies, do you need a trained Islamic scholar? Would another inmate be a less restrictive alternative? What is the nature of the claim with respect to who would lead the studies that are not being provided, in addition to the Jumu'ah ones? My understanding is that you don't need anyone necessarily trained to lead the studies, and that simply somebody who's willing and familiar with the types of studies can lead it. In fact, as I mentioned previously, you could simply have a DVD instruction or a DVD leading you through those sorts of studies, such that the kind of the volunteer requirement is largely a red herring. I'd also like to address the TDCJ's point about volunteers and proximity to Houston. That, I mean, that may well be true, but, and whether that specific point is in the record or, I know it's not in the briefing, but even if it were, it just adds to the fact that this is summary judgment. These are disputed facts. They're, the TDCJ is saying, well, proximity to Houston is a relevant factor in determining whether we have taken appropriate steps to provide volunteers so that these studies can be conducted. Didn't that make them have to try more for volunteers, just because, you know, as opposed to being in the middle of nowhere, where there's only a thousand people in hundreds of miles, and none of them are Muslim and able to come, that's different from, as he was saying, Houston's right there, you know, a lot of Muslims, so on and so forth. That strikes me as then you could get volunteers, and it's just that they're not, they're either not trying or they're making it difficult. Exactly, which makes it more striking that these studies haven't been led for years. There's no explanation then for why they can't. But, I mean, for there to be a fact issue, there needs to be some facts on this, so tell me your best fact on this. I mean, the facts were the same that I had mentioned earlier, which is facts in the record show that there's active discouragement of volunteers, that the policies are not being applied, although there are policies that chaplains need to be hired, chaplains need to then go out and find volunteers. I mean, the application of those policies are inconsistent with respect to the Muslim faith, that those, that they've been understaffed on chaplains, and admittedly so, that those chaplains are then responsible for hiring, or for, not hiring, for marshaling the volunteers to come, and that volunteers are, you know, based on the record, absent, entirely absent. And so those are the facts that show that the TDCJ is not applying their policies as they're stated, and calling to question whether they've actually, whether their, their position that a volunteer is even necessary is, is furthering a compelling government interest in security, or time, ways, and means, or whatever the compelling interest is that they have identified. If this case is remanded, will you continue to represent Mr. Lozano as a pro se? I have not spoken to Mr. Lozano about that. I know my engagement letter simply goes through the appeal. Through the Fifth Circuit representation? Yes, Your Honor. The Fifth Circuit requested me to act as pro bono counsel, and we have not discussed any arrangements to continue that. And it would, I would have to, I would have to work through my firm to make sure that that's something that we could do. But I will have that conversation with my client. Okay. Thank you. Thank you. Thank you both. The case is now under submission.